**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No.   **4:16 CR 157 AGF** |
| | ) | |
| **SHAUN HAYES,** | ) | |
| | ) | |
| **Defendant.** | ) | [Redacted Text of Doc. No. 236] |

**UNITED STATES' SENTENCING MEMORANDUM**

Comes now the United States of America, the plaintiff herein, by Carrie Costantin,

Attorney for the United States, Acting Under Authority Conferred by 28 U.S.C. Section 515, and

James E. Crowe, Jr., and Gilbert C. Sison, Assistant United States Attorneys for the Eastern

District of Missouri, and submits this sentencing memorandum.

**I.**                        **--Request for Seal---Priority**   [Victim Information Redacted]

1

II.    **Sentencing Factors**

A.    **Introduction**    [Victim Information Redacted]

This Court will sentence the defendant, Shaun R. Hayes on May 23, 2018.   The Court is well aware of the sentencing factors set forth in Title 18, United States Code, Section 3553(a) as well as the broad range of information the Court can take into account in addressing those factors. Where, as here, the criminal activity caused millions of dollars in loss and threatened the very soundness of a bank, sentencing considerations such as "seriousness of the offense" and "promote respect for the law" and "afford adequate deterrence to criminal conduct" are paramount.   The sentencing factors of "just punishment" and "protect[ing] the public from further crimes of the defendant" are salient here given the gravity of the offense and the many individual losers left in the defendant's wake.   Certainly the record in this case and the defendant's devastating last few years in the banking business establish beyond doubt that the public must be protected from this defendant.   The sentencing factor "history and characteristics of the defendant" as set forth in Section 3553(a) is the thread that ties the other factors together.   The defendant has proven himself to be bright and resourceful in presenting "opportunities" to others and he has been shown to be frighteningly persuasive.

One of the persons left dangling in the defendant's financial web has referred to the defendant's "meteoric career" in banking and his one-time status as a "rising banking star." (        letter.)   That person and a number of others, mostly recruited by the defendant, made money as shareholders in Allegiant Bank when it was bought out by National City Bank.   As it

turns out, that good fortune did nothing more than make them vulnerable to the defendant's magic touch. He moved on to other ownership or influential positions at other banks and drew in some of the same people, along with new recruits, to financial institutions that failed after his involvement. In this memorandum we will outline the impact he had on three failed banks.   We will show that he profited significantly notwithstanding Excel Bank's downward spiral.   Of course, a failed bank causes harm to more than the FDIC insurance fund.   Individual employees of Excel Bank lost a significant part of their nest eggs when Excel bank stock zeroed out.   And the defendant went on with his questionable schemes even after being banned from the banking industry in 2013.   The record here on each of the Section 3553(a) factors weighs strongly against the defendant.

**B.**     **Three Failed Banks**

In the time frame 2007-2010 the defendant had significant, if not controlling, positions in three St. Louis area banks.   He was the controlling shareholder in Excel Bank and was paid as a consultant.   The FDIC Examination in 2009 concluded that the defendant "exerts a controlling influence over the bank." (Att. A. p. 34.)   The FDIC noted in particular the defendant's establishing the Loan Production Office (LPO) in Clayton as reflective of that control.   Far from Excel Bank's Sedalia origins and headquarters, the LPO office in Clayton housed the defendant, Timothy Murphy and a few others and served as the base for the undoing of the bank. In addition to his virtual complete control of Excel Bank, the defendant was also the Chief Executive Officer of Sun Security Bank (paid $300,000.00 annually) and was a paid consultant at Truman Bank where he was paid about $100,000.00 annually.   (PSR pars. 81-82.)   All three banks failed.

Excel Bank lost $3.9 million on the Eighteen Investments loans purchased from Centrue Bank and National City Bank as a result of the scheme set forth in the indictment.   (PSR par. 32.) And the defendant and Litz executed that scheme at a time when the Eighteen Investments notes

already held by Excel Bank were classified as substandard. (Att. A. p. 21.) Of course, the criminal scheme sought to conceal the fact that Excel Bank was, in fact, being saddled with millions of additional dollars in bad Eighteen Investments notes.   In the FDIC Examination conducted in October 2009 just two months after the            note was signed, Excel Bank was downgraded two levels from Satisfactory to Deficient based on the substandard real estate lending then known by the FDIC.   The only lower classification category assigned by the FDIC is Critically Deficient which was the assessment in October 2012 when the Missouri Division of Finance closed Excel Bank and appointed the FDIC as receiver.   It is very likely that the bank would have been closed in 2009 if this scheme had become known to the FDIC. (Att. A. p. 1.)   When Excel Bank was closed in 2012, the FDIC estimated that the loss to the FDIC fund would be $40.9 million.   That figure was adjusted to $29.2 million as of year end 2017. (Att. C.)   Truman Bank and Sun Security Bank suffered a similar fate at the defendant's hands.

Sun Security Bank was closed in October 2011 and the estimated loss to the FDIC fund as of year end 2017 was $93.1 million.   Similarly, Truman Bank was closed in September 2012, and the estimated loss to the FDIC fund as of year end 2017 was $39.7 million. (Att. C.)   The current fund loss estimates for the three failed banks is somewhat in excess of $160 million.   Clearly the defendant is not solely responsible for these staggering losses, but he was certainly a significant contributor to these downfalls.   Market conditions had a major impact on these losses as well. But the FDIC Examination in 2009 cited the danger in growing a real estate loan portfolio in a time of "stressed market conditions." (Att. A. p. 1.)   The defendant did that very thing at Excel Bank in 2009 and he hid it from the FDIC.   At that point, the failure of the bank was virtually assured.

**C.**   **Hayes Profits from Excel**      [Victim Information Redacted]

Investors Financial Corporation (IFC) was the holding company for Excel Bank. Shaun Hayes gained voting stock control of IFC in October 2007.   From that time through March 2010, he received the following direct payments from IFC and Excel Bank:

| | |
|---|---|
| IFC dividends | $ 1,286,227 |
| IFC management fees | $   359,854 |
| Excel Bank consulting fees | $   216,995 |
| **Total** | **$ 1,863,076** |

Payments stopped only because the FDIC called a halt to the consulting fees and dividends after the examination in October 2009.   The FDIC found that there was no support for the duties that the defendant supposedly performed for IFC or the bank. (Att. A. p. 13.) (The FDIC also criticized the bank's reimbursement of the defendant's expenses---items not included in the above total.)   It should be noted that over half of the total shown above was paid out after the infusion into Excel Bank of $4 million in TARP funds in May, 2009.   Moreover, the payments continued during the illegal profiting the defendant enjoyed in 2009 from the criminal conduct to which he has plead guilty.

In early April 2009 the defendant received a $305,000.00 payment from the Rolling Hills loan which is the subject of Count Ten.   Several months later, in August 2009, the          straw party loan was consummated and the defendant's liability for the $906,000.00 McKnight-Man delinquency at Centrue Bank was extinguished.   And his profiting from Excel Bank did not stop there.

Hayes gained 52.3 % of the IFC voting stock in October 2007 through a totally leveraged transaction.   The seller financed $1.3 million of the sale and the defendant obtained a loan from

Centrue Bank in the amount of $5.3 million.   The remainder of the purchase price was delineated as "cash" but that too was paid with borrowed funds. By early 2009, Centrue Bank was preparing to call the defendant's note.   Not surprisingly he found the solution to that problem at Excel Bank.

        In May 2009, the defendant directed that Excel Bank make unsecured loans in identical amounts of $1.6 million to                        and                        .   These individuals were longtime associates of the defendant in questionable loan transactions.   In fact, at the very time these loans were being made, the defendant,              and              were being sued (along with other partners) by Bank of America on a delinquent loan relating to a real estate development in Alabama.   That loan was in the amount of $9.2 million.   The delinquent loan and lawsuit were not disclosed to the loan committee at Excel Bank.   The proceeds from the              loan were paid over to Centrue Bank to reduce the defendant's debt there.   (The remainder of the Centrue loan was paid off by loan funds from Truman Bank secured by the defendant's IFC stock which was rapidly declining in value.)   The proceeds of the Excel Bank loan to              were paid to reduce the seller financed and "cash" components of the defendant's purchase of the IFC stock.   The upshot of the              and              loans is that the defendant benefitted by at least $3.2 million and Excel Bank was the big loser.

        The              and              loans were similar in nature to the              loan.   While they were well versed in the defendant's financial deceptions,              and              were essentially straw parties in that they were assured that they would be taken out of the loans by the defendant. (The              loan was re-financed at Sun Security which later charged off over $1 million.)   As a cover, the defendant "sold" them some of his IFC stock although he maintained control of the stock.   Of course, the true purpose of the loans was to satisfy his obligations on the purchase of the IFC stock and that purpose was concealed from the bank.   The FDIC later found that the

and             loans violated a number of regulatory provisions and formed the basis, in part, for the subsequent Rule 8(e) removal proceeding which ended in the defendant being permanently barred from the banking industry.

Based on the above analysis, the defendant derived direct benefits totaling in excess of $6.2 million from Excel Bank in slightly over two years after the purchase of the IFC stock. Meanwhile, he was putting the bank in jeopardy with each transaction.

**D.**    **ESOP Losses**        [Victim Information Redacted]

                      is one of the longtime Excel Bank employees who have submitted letters to the Court.   These persons worked at the main office in Sedalia and were far from the defendant's freewheeling loan scheme at the LPO in Clayton.   She aptly reminds us that this case does not involve a "victimless crime."   Apart from the losses to the FDIC fund and certain individuals who participated in some of the transactions, the employees of Excel Bank were victims of the crimes here as well.   The bank had an ESOP retirement program that many of the employees looked to as their principal source of financial security.   Their letters describe to the Court the devastation they experienced due to the financial and emotional toll that the bank's demise had on them.   And they justifiably point the finger of blame at Shaun Hayes.

                      , a 38 ½ year employee, writes of the notion in 2007 that Hayes would be the "Golden Boy" who would "grow the bank."                      describes the defendant's boast to the employees that "he could see our ESOP accounts 'doubling in 5 years.'" What they did not realize is that the defendant would ravage the bank both through his personal profiteering as well as his criminal conduct.   In the end they felt "lied to" and "betrayed."

(        letter;                 letter.)   The individual ESOP account losses reported in the letters are as follows:

| | |
|---|---|
| high $104,000 | closing at $2,192 |
| high $145,000 | closing at $2,828 |
| high $105,000 | closing at $2,000 |
| high $100,000 | closing at $1,200 |
| high $156,442 | closing at $2,072 |

Each of the letters relates the importance of the ESOP account to these trusted and loyal employees of Excel Bank.                     is typical of the group when she refers to the account as her "primary retirement."              also typifies the group in characterizing the defendant's criminal conduct as "robbing me of my retirement funds."                     sums up the sentiments and feelings of the former employees as follows:

> [Shaun Hayes] did irreparable financial and emotional damage to the employees of Excel Bank and deserves to be rightly punished for it.   This is besides all the damage he did to Excel Bank's good reputation with our customers and the communities we served.
>
> *          *          *
>
> Judge Fleissig, Shaun Hayes deserves to pay for what he has done. We will never regain what we have lost.   Not only did we lose monetarily, but I lost faith and trust in the system.   I feel personally betrayed by Shaun Hayes.

These individuals will never get back their financial losses, but they look for Shaun Hayes to be held accountable in this prosecution.

**E.      Bad Loans Made to Conceal Fraud**      [Victim Information Redacted]

The defendant and Litz knew that they had to show progress on the loans made at Excel Bank to buy out the delinquent Eighteen Investments loan pools at Centrue Bank and National City Bank.   In addition, within a year of the              loan being made, an attorney for confronted the defendant, Murphy and Litz with the claim that              had been defrauded in the

transaction.   Minimal if any legitimate payments were being made on those loans.   As a result, the defendant and Litz recruited other individuals to serve as straw parties for new Excel Bank loans the proceeds of which were used to pay down            and related loans.    This was alleged in the Superseding Indictment (Count One pars. 32-33.) and was further agreed to in the defendant's Guilty Plea Agreement (Doc. 165 pp. 6-7).   In effect, the new loans constituted nothing more than further acts of concealment from the bank itself as well as the federal and state regulators.

For instance, the Murdoch Management loans were made to make a substantial payment on the            loan but that fact was concealed from the loan committee.   Since some $300,000.00 of the Murdoch Management loans had to be used to pay off first mortgages against the properties, only about $400,000.00 of those loan proceeds were allocated to the            loan on the books of Excel Bank.   Even that amount provided no benefit to the bank since the            loan was being paid down with more Excel Bank loan finds and not new money coming into the bank.   Making matters worse, Murdoch Management was nothing more than a shell entity.   Its principal,                     , was Litz's executive assistant and was, by her own admission, not creditworthy.   She ended up taking an uncollectible default judgment of over $700,000.00 and the bank was left with a few more substandard residential properties.

This was typical of the loans made to cover the initial round of straw party loans. But the FDIC examiners were able to identify the irregular nature of these loans in the December 2010 examination.   While the FDIC analysis was, at that point, far short of discovering the scope of the fraud, the examiners were able to identify most of the Eighteen Investments "concentration" which it classified as substandard. (Att. B. pp. 3, 65.)   Those entities and individuals include the following:

**Relating to the                 Note (Centrue pool)**

Murdoch Management --- 5 properties purchased

BBRE Properties (                    )--- 9 notes purchased

Chateau Thierry (                 ) --- 1 note purchased

Clayton Legal (                 ) --- 6 notes purchased

Deer-Lind (             ) --- 2 notes purchased

**Relating to the National City Pool**

Chateau Thierry (                    ) --- 9 notes purchased

Lindworth Investments (              and              --- 16 notes purchased

Many of the above transactions (and others as well) were concluded in December 2010 even as the

FDIC examiners were doing their work at Excel Bank.   It was nothing less than a mad scramble

by the defendant and Litz to conceal the fraudulent and substandard nature of the              loan and

the loans made to purchase the National City pool.                is shown above and has written

the Court concerning the defendant's sentencing.   He considered Hayes a trusted friend only to

find that the defendant and Litz had drawn him into a "scam."              summed up his

involvement as follows:

> This deal was a fraud from the onset and I was targeted as an unquestioning
> victim, shattering any illusion of genuine friendship and embroiling me in a
> large scale criminal enterprise.

     believes that he and others suffered not only financial loss but a loss of reputation as

well as a result of their dealings with the defendant and Litz.

It came as no surprise when, pursuant to its December 2010 examination, the FDIC

reduced the Excel Bank rating to a 5, the lowest possible, based on the assessment that the bank's

condition was critically deficient. (Att. B. p. 1.)   While the facts still unknown to the FDIC

foretold a certain bank failure, only subsequent investigation would uncover the truly criminal nature of the complex scheme orchestrated by the defendant and Litz.

**F.**     **Business Activity After Excel Bank**     [Victim Information Redacted]

By October 2012, Excel Bank and the other Hayes-affiliated banks had failed.   In December 2013, the FDIC entered its order barring the defendant from further involvement in the banking business.   Despite those setbacks, the defendant was actively pursuing other business and investment activities that once again came under the scrutiny of law enforcement.   The Presentence Report (PSR par. 80) details his role in Cambridge Adult Day Care which the defendant and several others formed in 2011.   The principal location for the business was an eleven story building located in south St. Louis at 4229 Michigan Avenue.   The defendant raised funds for Cambridge as they attempted to do business in multiple locations in eastern Missouri. Consistent with the problems at Excel Bank, investors lost money in Cambridge and many have claimed that they were defrauded by the defendant.   The Missouri Secretary of State's office agrees.

In September 2017, the Secretary of State entered a cease and desist order against the Cambridge business, the defendant and other business entities associated with him including Universal Exports LLC.   It was determined that the investments offered by the defendant were unregistered securities.   Central to the order was the finding that the defendant and another person had raised in excess of $1.3 million from 2012 to 2014 from investors in Cambridge-related businesses, further determining that most of those funds had been diverted.   The order found that investor losses exceeded $1 million. (Att. D. pp. 2-3.)

One of the investors who suffered greatly at the defendant's hands was                who is the person referred to as "MR1" in the Secretary's order. (Att. D. pp. 5-7.)            was the

guarantor on the $1.6 million loan that funded the re-purposing of the 4229 Michigan building for use as an adult day care center.   According to            , the defendant and his associates manipulated the records of the business so as to limit or eliminate the ownership interest promised to him.   In addition, due to some related financial arrangements with the defendant,            found that the defendant had placed a second mortgage on             farm property in Miller County, Missouri.   (The lien showed Universal Exports as the holder of the mortgage.   The defendant has recently agreed to release that mortgage.)            and       ife declared bankruptcy in 2014. (Att. D. p.7.)

The Secretary of State's order states that there were ten or more investors caught up in the Cambridge scheme. (Att. D. pp. 2-3.)                  has written to the Court outlining a series of fraudulent acts by the defendant relative to the Cambridge business.   She helped finance the opening of at least one center in southeast Missouri and made a further investment in several vehicles.            alleges that the defendant left her with a losing business as well as unpaid obligations on the vehicles.    According to her letter, the defendant also persuaded            to invest in a debt service entity.   She lost $10,000.00 more in that venture.   She states that the defendant "destroyed" her financial situation.            goes on to write:

> [Hayes] is cunning, intelligent, a prolific motivator, expert at gaining misled trust but even better at deceiving people with lies, misrepresentations and coercion.   Shaun Hayes has total disregard for everyone except himself and I have experienced this behavior first hand.

> *               *                *

> Shaun Hayes is a predator and will continue to swindle and defraud anyone who trusts him as long as he has access to a phone and face-to-face opportunities.

> advises that she expects to file bankruptcy in the near future.

Even the lever of court supervision did not constrain the defendant from pursuing the Cambridge business despite his denial of involvement in that business while he was free on bond.  (Doc. 129 p. 6.)   As a condition of his pretrial bond in this case, the defendant was required to clear any business activities with his Pretrial Services Officer and comply with the Third Party Risk conditions.   Magistrate Judge Mensah revoked his bond based on widespread violations of those conditions.   After a lengthy hearing, Magistrate Judge Mensah entered a twelve page order revoking the bond.   As a result, the defendant has remained in custody since April 2017.

The evidence at the hearing showed the defendant's persistent activity to further the business of a health care company named Atlas.   He did not disclose that business to the Pretrial Services Officer.   In stark violation of that bond condition, the defendant worked on behalf of Atlas for a number of months, even going so far as to actively negotiate for the purchase by Atlas of a health care facility in Topeka, Kansas.   He also recruited others to join the venture and requested a $6,000.00 payment for his services at a given point. (Doc. 129 pp. 5-6.)   It goes without saying that this defendant poses a financial threat to others even when he is on court supervision.

## III.   <u>Conclusion</u>        [Victim Information Redacted]

The record in this case and the defendant's demonstrated propensity to bring financial harm to others clearly support the imposition of a lengthy prison term for this defendant.   The analysis of the Section 3553(a) factors makes this assertion even more compelling.   The seriousness of the offense before the Court is obvious.   The gravity of these offenses is underscored by this defendant's contribution to the failure of Excel Bank as well as to the failures of Sun Security Bank and Truman Bank.   A stern prison term here will certainly

constitute a "just punishment."   Moreover, the defendant has been the subject of numerous articles in the St. Louis Business Journal as well as the St. Louis Post-Dispatch. He is very well known in the business community and his sentence will receive significant attention there. Accordingly, he should receive a sentence that will deter others from his reckless and fraudulent practices and "promote respect for the law" by showing where those practices will lead. Incarceration will also better "protect the public from further crimes of the defendant."   This Court has before it an abundance of evidence of those being harmed by the defendant.    And the bond revocation hearing shows that he will even ignore direct legal constraints when pursing his reckless financial schemes.

Finally, the "history and characteristics" of this defendant cry out for a lengthy prison term.   The letters to the court aptly describe him as a liar, a predator and a person who betrays trust, even robbing some of their retirement funds.                                        , the 38 ½ year Excel Bank employee, summed it up best: "Not only did I lose monetarily, but I lost trust and faith in the system."   Shaun Hayes has left failed banks and many betrayed individuals in his wake. Now is the time for him to be held to account.

WHEREFORE, the defendant should receive a sentence that reflects the factors and policies prescribed in 18 U.S.C. Section 3553(a).

Respectfully submitted,

CARRIE COSTANTIN
*Attorney for the United States

 s/James E. Crowe, Jr.
JAMES E. CROWE, JR., #23196MO
GILBERT C. SISON, #52346MO
Assistant United States Attorneys

* Attorney for the United States Acting Under Authority Conferred by 28 U.S.C. Section 515

## **CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that on May 29, 2018, a true and accurate copy of the foregoing was filed via the Court's electronic filing system and emailed to all counsel of record.

*s/James E. Crowe, Jr.*
 JAMES E. CROWE, JR., #23196MO
GILBERT C. SISON, #52346MO
Assistant United States Attorneys



# FEDERAL DEPOSIT INSURANCE CORPORATION

# REPORT OF EXAMINATION

## THIS REPORT OF EXAMINATION IS CONFIDENTIAL

This report of examination has been made by an examiner appointed by the Board of Directors of the Federal Deposit Insurance Corporation for use in the supervision of the bank. The information contained in this report is based upon the books and records of the bank, upon statements made to the Examiner by directors, officers, and employees, and upon information obtained from other sources believed to be reliable.

It is recommended that each director, in accordance with his/her responsibilities both to depositors and to shareholders, thoroughly review the report. In making this review, it should be kept in mind that while an examination includes some audit tests, it is not to be construed as an audit, and this report should not be considered an audit report.

This copy of the report is the property of the Federal Deposit Insurance Corporation and is furnished to the bank examined for its confidential use. Under no circumstances shall the registrant, or any of its directors, officers, or employees disclose or make public in any manner the report or any portion thereof. If a subpoena or other legal process is received calling for reproduction of this report, the Regional Office of the Federal Deposit Insurance Corporation should be notified immediately. The attorney at whose instance the process was issued and, if necessary, the court which issued it, should be advised of these restrictions and referred to Part 309 of the Federal Deposit Insurance Corporation Rules and Regulations.

Sheila C. Bair
Chairman

### EXCEL BANK
### SEDALIA     PETTIS     MISSOURI

| | | | |
|---|---|---|---|
| Region: | Kansas City | Certificate Number: | 19189 |
| Examiner-In-Charge: | Tiffany A. Kampschroeder | | |
| Examination Start Date: | October 26, 2009 | | |
| Examination As Of Date: | September 30, 2009 | | |

## OFFICE COPY

# FEDERAL DEPOSIT INSURANCE CORPORATION

ATTACHMENT A

| Examination Conclusions and Comments | 19189 |
|---|---|

| | Current Exam | Prior Exam | Prior Exam |
|---|---|---|---|
| Ratings by Examination Function | 10/26/2009 | 06/23/2008 / S | 02/07/2007 |
| Risk Management Composite | 4 | 2 | 2 |
| Risk Management Component: | | | |
| Capital | 4 | 2 | 2 |
| Asset Quality | 4 | 2 | 2 |
| Management | 4 | 2 | 2 |
| Earnings | 3 | 2 | 2 |
| Liquidity | 4 | 2 | 2 |
| Sensitivity to Market Risk | 3 | 2 | 2 |

[1]Rating assigned at 9/10/2007 Examination
[2]Rating assigned at 9/10/2007 Examination


## SUMMARY OF CONDITION

The overall condition of the institution is deficient.  Management oversight is poor as a decision to grow the loan portfolio in stressed market conditions, funded with non-core funding, has had a negative impact on the institution.  Asset quality is deficient with an elevated level of criticized assets, numerous underwriting and credit administration deficiencies, and an inadequately funded ALLL.  Consequently, capital has fallen to less than satisfactory levels.  Further deterioration is likely due to a high concentration in commercial real estate (CRE) loans coupled with potential impairment arising from trust preferred securities.  Earnings performance is less than satisfactory as a result of required loan loss provision expenses and recognized losses in the securities portfolio.  The liquidity position is deficient since management used non-core funding sources to facilitate growth.  The Net Non-Core Funding Dependence ratio exceeded 41 percent as of October 31, 2009.  Furthermore, as of October 26, 2009, the borrowing line at the Federal Home Loan Bank (FHLB) was nearly depleted, and remaining borrowing lines are discretionary.  Interest rate risk monitoring is in need of improvement.


## RISK MANAGEMENT

### Asset Quality – 4

Asset quality is poor as evidenced by a high volume of classifications, unsatisfactory risk identification practices, and numerous loan-related apparent violations.  Credit administration and underwriting weaknesses also persist.

Since the previous examination, management opened a loan production office (LPO) in Clayton, Missouri.  As a result, loan growth exceeded 50 percent since September 30, 2008, and the growth is concentrated in CRE.  Although these loans have not had time to fully season, many of the asset quality related criticisms, and 53 percent of the dollar volume of adversely classified loans, originated from the St. Louis, Missouri, market and are serviced at the Clayton, Missouri, LPO.

Adversely classified assets total $19,593M at this examination, with $756M in Loss.   This dollar volume accounts for more than 88 percent of Tier 1 Capital and reserves as of September 30, 2009, and is up from 35

ATTACHMENT A

| Risk Management Assessment (Continued) | 19189 |
|---|---|

6.   **Is Board supervision adequate, and are controls over insider transactions, conflicts of interest, and parent/affiliate relationships acceptable?**

No.  The Board does not enforce prudent controls over transactions with Investors Financial Corporation of Pettis County, Inc. (IFC), the bank's holding company.  On August 26, 2008, the two entities entered into a management agreement that allows both to retain each others' services.  The agreement details how the bank will reimburse IFC for services rendered and costs incurred on behalf of the bank.  The agreement also states that IFC is responsible for maintaining documentation that would support charges to the bank.  The bank has been paying IFC $60M monthly; however, management was unable to provide adequate information supporting the fees paid or that those fees are consistent with market rates.  A substantial portion of the monies paid to the holding company are remitted to shareholder Hayes, who provides services to the holding company.  Management was unable to produce sufficient documentation supporting duties performed for the holding company or bank and the corresponding time records.  Furthermore, Mr. Hayes directs securities purchases for the bank, which is not a permissible activity under the agreement.  Finally, the bank reimbursed expenses for Mr. Hayes which are not allowed by the agreements.  Management should abide by the agreement in place and document fees paid to the holding company.

*committed to better document fees paid to the holding company.*

ATTACHMENT A

| Items Subject to Adverse Classification (Continued) | | | 19189 |
| --- | --- | --- | --- |
| | | CATEGORY | |
| AMOUNT, DESCRIPTION AND COMMENTS | Substandard | Doubtful | Loss |

   2,685                           2,279
EIGHTEEN INVESTMENTS, INC.

)

21

[Remainder of Page Redacted]

ATTACHMENT A

| Confidential - Supervisory Section | . | 19189 |
|---|---|---|

## OWNERSHIP AND CONTROL

Investors Financial Corporation, Inc., Sedalia, Missouri, owns 100 percent of the bank's common stock.   Control of the holding company is concentrated with the following individuals:

| Owner of Record | Ownership Percentage |
|---|---|
| | |
| Shaun R. Hayes and his family | 35.1 percent |

[Remainder of Page Redacted]

ATTACHMENT A

KCM 3/10/2011



# FEDERAL DEPOSIT INSURANCE CORPORATION

# REPORT OF EXAMINATION

## *THIS REPORT OF EXAMINATION IS CONFIDENTIAL*

This report of examination has been made by an examiner appointed by the Board of Directors of the Federal Deposit Insurance Corporation for use in the supervision of the bank. The information contained in this report is based upon the books and records of the bank, upon statements made to the Examiner by directors, officers, and employees, and upon information obtained from other sources believed to be reliable.

It is recommended that each director, in accordance with his/her responsibilities both to depositors and to shareholders, thoroughly review the report. In making this review, it should be kept in mind that while an examination includes some audit tests, it is not to be construed as an audit, and this report should not be considered an audit report.

This copy of the report is the property of the Federal Deposit Insurance Corporation and is furnished to the bank examined for its confidential use. Under no circumstances shall the registrant, or any of its directors, officers, or employees disclose or make public in any manner the report or any portion thereof. If a subpoena or other legal process is received calling for reproduction of this report, the Regional Office of the Federal Deposit Insurance Corporation should be notified immediately. The attorney at whose instance the process was issued and, if necessary, the court which issued it, should be advised of these restrictions and referred to Part 309 of the Federal Deposit Insurance Corporation Rules and Regulations.

Sheila C. Bair
Chairman

**EXCEL BANK**
**SEDALIA        PETTIS        MISSOURI**

| | | |
|---|---|---|
| Region: | Kansas City | Certificate Number: 19189 |
| Examiner-In-Charge: | Nathan D. Peters | |
| Examination Start Date: | December 06, 2010 | |
| Examination As Of Date: | December 31, 2010 | |

## OFFICE COPY

# FEDERAL DEPOSIT INSURANCE CORPORATION

FDIC 6600/01A (9-94)

ATTACHMENT B

| Examination Conclusions and Comments | | | 19189 |
| --- | --- | --- | --- |

| Ratings by Examination Function | Current Exam 12/06/2010[1] | Prior Exam 05/03/2010 / S | Prior Exam 10/26/2009 |
| --- | --- | --- | --- |
| **Risk Management Composite** | 5 | 4 | 4 |
| **Risk Management Component:** | | | |
| Capital | 5 | 4 | 4 |
| Asset Quality | 5 | 4 | 4 |
| Management | 5 | 5 | 4 |
| Earnings | 4 | 3 | 3 |
| Liquidity | 5 | 4 | 4 |
| Sensitivity to Market Risk | 4 | 3 | 3 |
| Information Technology | 2 | | |
| Compliance[2] | 3 | | |
| Community Reinvestment Act[3] | Satisfactory | | |

[1]The examination started on December 6, 2010, using September 30, 2010, Call Report data.  Due to significant changes that took place in the fourth quarter, this Report reflects updated financial information as of December 31, 2010, which became available during the examination.
[2]Rating assigned at July 12, 2010, examination
[3]Rating assigned at September 10, 2007, examination

## SUMMARY OF CONDITION

The bank's condition has deteriorated and is now critically deficient, posing a distinct threat to the institution's future viability.  Asset quality is critically deficient, and an excessive volume of problem assets has negatively affected all operational areas of the bank.  The management team's performance and liquidity are unacceptable, and capital is inadequate to support the institution's increased risk profile.  Earnings are poor, and sensitivity to market risk is inadequately controlled.

## MATTERS REQUIRING BOARD ATTENTION

While numerous recommendations are described within this Report of Examination due to the bank's critically deficient condition, the Board should focus on the following items:

- Strengthening management oversight and leadership;
- Reducing the level of adversely classified items;
- Improving underwriting and credit administration practices;
- Augmenting the bank's capital position; and
- Continuing its efforts to meet the requirements of the provisions of the Consent Order.

The Board's attention to these matters is essential to effect improvement in the bank's condition and ensure its future viability.

ATTACHMENT B

| Examination Conclusions and Comments (Continued) | 19189 |
|---|---|

## CONSENT ORDER

A Consent Order between the bank and FDIC became effective March 16, 2010. As detailed below, the bank's Tier 1 Leverage Capital ratio and Total Risk-Based Capital ratio remain below the minimums specified in the Consent Order. In addition, further efforts are required to maintain qualified management; develop adequate problem asset risk reduction plans; approve risk reduction plans, advances to adversely classified borrowers, and loans that do not conform to the bank's Loan Policy; maintain an appropriately funded Allowance for Loan and Lease Losses (ALLL); comply with the written capital plan submitted to regulatory authorities; enhance written funds management policies; and eliminate and prevent apparent violations. Refer to the *Compliance with Enforcement Actions* pages for further details.

## RISK MANAGEMENT

### Asset Quality – 5

Asset Quality is critically deficient and has continued to deteriorate since the last examination. In seven months' time, adversely classified items (ACI) increased by $27,309M, or 80 percent. The ACI Coverage ratio has increased to 246 percent and approximately 22 percent of the bank's assets are now adversely classified. The severity of adverse classifications has also increased. While most of the increase in the dollar volume of ACI has taken place in the least severe Substandard category, the dollar volume of items adversely classified Doubtful and Loss has increased by $1,016M and $3,274M, respectively. The $5,487M in reductions in adversely classified loans that has occurred since the prior examination has been more than offset by $32,540M in additions. While the majority of additions derive from deterioration in existing credits, $2,628M of additions consist of credits originated since the prior examination. Refer to the *Analysis of Loans Subject to Adverse Classification* page for further information regarding changes in adversely classified loans since the prior examination.

The purpose of all newly extended adversely classified credits was to purchase properties from existing borrowers at this institution. Executive Vice President (EVP) Timothy P. Murphy was the originating loan officer for both the existing customers and the new customers. The loans to the new borrowing relationships (Lindworth Investments, LLC; Deer-Lind Properties, LLC; Murdoch Management, LLC; Chateau Thierry II, LLC; and                ) all evidence poor underwriting, including the failure to require down payments from the new borrowers. Refer to the *Items Subject to Adverse Classification* pages for additional information regarding these transactions.

As noted at the prior two examinations, the bank's asset quality problems are a direct result of management's loan growth strategy coupled with inadequate underwriting practices. In 2007, executive officer Shaun R. Hayes became the holding company's largest shareholder. In 2008, the bank opened a loan production office (LPO) in Clayton, Missouri, and began to substantially grow its commercial real estate (CRE) portfolio in the St. Louis, Missouri, market during a time when that market was evidencing economic distress. Net loans and leases grew 56 percent in 2008 and 48 percent in 2009.

EVP Murphy is the primary lender at the LPO, and as of November 30, 2010, his loan portfolio totaled over $71,000M and accounted for approximately 30 percent of the total portfolio. As of the same date, approximately $15,659M (22 percent) of his portfolio was past due over 30 days, comprising 48 percent of all past due loans. The total past due ratio is 8.49 percent. EVP Murphy's portfolio contains approximately 51 percent of the dollar volume of adversely classified loans. Furthermore, this level would be higher if loans originated by EVP Murphy but later transferred to other officers were considered. At the prior examination, examiners recommended that EVP Murphy reduce his then $101,000M portfolio.

| **Examination Conclusions and Comments (Continued)** | **19189** |
|---|---|

Also contributing to the bank's poor asset quality is a concentration of credit to entities involved with Eighteen Investments, Inc.  Loans in this concentration primarily involve the financing of investment residential real estate, although some are unsecured.  As of November 5, 2010, examiners estimate that this concentration totaled approximately $14,476M; however, management is working to compile an inclusive list of related entities, so the total could be higher.  The *Concentrations* page includes a list of all borrowers in this concentration.  Among those borrowers, examiners adversely classified $13,803M in loans related to Eighteen Investments, Inc; including Murdoch Management, LLC;                           ; S & P Properties, Inc; Caesar Investments, LLC; Leonard Assets, LLC; G. Stafford Company; Lindworth Investments, LLC;                    ; Cardinal Investments, LLC; Chateau Thierry II, LLC; Deer-Lind Properties, LLC;                      ; and                      .  Refer to the *Items Subject to Adverse Classification* pages for additional details regarding these borrowers.  This concentration of credit has resulted in sizable losses to this institution.  Mr. Hayes is personally involved in business ventures with Michael Litz, who is one of the owners of Eighteen Investments, Inc.  This is of concern because it appears that Mr. Hayes was instrumental in bringing this concentration to Excel Bank through his business relationships.

Asset quality problems are further exacerbated by improper loan underwriting and credit administration procedures, poor risk identification, insufficient loan administration staffing, and an improper loan approval process which does not allow for the evaluation of all prudent information prior to making a credit decision.  Refer to the *Risk Management Assessment* pages for additional information regarding these deficiencies.

***At the January 27, 2010, meeting, management and the Board committed to improve asset quality and associated practices.***

## Management – 5

The Board and management team's performance are unacceptable.  Management has been ineffective at restoring the institution to a satisfactory condition, and must work quickly to reduce the institution's risk profile in order to ensure its future viability.  The Board is ultimately responsible for the bank's condition and must make certain that competent individuals are in place to address the magnitude of problems facing the bank.  Several provisions of the outstanding Consent Order require further management efforts.  Management's poor risk selection is a primary contributor to critically deficient asset quality that is significantly and adversely affecting the bank's operational areas.  Underwriting and credit administration weaknesses persist, and risk identification is poor and has caused the ALLL to be inappropriately funded.  The bank is operating without sufficient capital, and liquidity and funds management practices are unacceptable.  In addition, earnings are insufficient, and sensitivity to market risk is inadequately controlled.

As highlighted earlier, management oversight of the lending function is wholly inadequate and is the primary cause of the bank's critical condition.  Management and the Board must ensure stronger credit underwriting, risk selection, loan administration, risk identification, and workout strategies

Since the prior examination, former Chief Credit Officer                        and former EVP resigned from the bank and its Board.  In addition,                       first replacement only worked at the bank for less than two months before leaving the bank's employment, and there are no prospects to fill the chief credit officer position.  These changes in personnel likely impact management's abilities to address the bank's problems.

Examiners identified apparent violations of seven banking laws at this examination.  Of particular concern is the repeat apparent violation of Part 337.3 of the FDIC Rules and Regulations involving an executive officer of the institution.  The significant number of apparent violations and repeat exceptions noted at this examination reflects

---

3

[Victim Information Redacted]                                    **ATTACHMENT B**

| Concentrations | 19189 |
|---|---|

Listed below are concentrations of obligations, direct and indirect, according to the following guidelines: 1) Concentrations of 25% or more of Tier 1 Capital by individual borrower, small interrelated group of individuals, single repayment source or individual project; 2) Concentrations of 100% or more of Tier 1 Capital by industry, product line, type of collateral, or short term obligations of one financial institution or affiliated group.  Any other concentrations may be listed in the 25% category if desired.  An appropriate percentage of total assets is used when a bank's capital is so low as to make its use meaningless. U.S. Treasury securities, obligations of U.S. Government agencies and corporations, and any assets collateralized by same are not scheduled.

| DESCRIPTION | DETAIL | AMOUNT EXTENDED |
|---|---|---|
| **Eighteen Investments, Inc. Concentration** | | |
| Caesar Investments, LLC | 285 | |
| Cardinal Investments, LLC | 1,194 | |
| Chateau Thierry, LLC | 303 | |
| Deer-Lind Properties, LLC | 237 | |
| | 111 | |
| Eighteen Investments, Inc. | 397 | |
| | 308 | |
| G. Stafford Company | 1,235 | |
| | 50 | |
| | 134 | |
| | 3,295 | |
| Leonard Assets, LLC | 3,428 | |
| Lindworth Investments, LLC | 1,112 | |
| Murdoch Management, LLC | 727 | |
| S & P Properties, Inc. | 1,203 | |
| | 50 | |
| | 194 | |
| | 100 | |
| | <u>113</u> | |
| | | 14,476[1] |

This concentration to a small interrelated group of borrowers represents 76 percent of Tier 1 Capital.

**Apartment Building Loans Concentration**                                                                24,498[2]

This industry concentration represents 129 percent of Tier 1 Capital.

**Construction and Land Development Loans Concentration**                                    26,813[2]

This concentration represents 141 percent of Tier 1 Capital.

**Non-Owner Occupied Commercial Real Estate Loans Concentration**                  87,547[2]

This concentration represents 460 percent of Tier 1 Capital.

[1]As of November 5, 2010
[2]As of December 31, 2010

[Victim Information Redacted]                                                        ATTACHMENT B

FDIC: HSOB Bank & Thrift Failures                                                    Page 1 of 1

📧 | 📶 | 📺 | 📘 | 🐦

Advanced Search

Printer Friendly Version   Each depositor insured to at least $250,000 per insured bank          Notes to Users

Download to CSV File

Table BF01

## Federal Deposit Insurance Corporation
## Failures and Assistance Transactions
## Missouri

(Dollar amounts in thousands)

| Effective Date(s): 2011 - 2017 | | |
|---|---|---|
| Insurance Fund | Charter Type | Transaction Type |
| ALL | ALL | ALL |

| Institution Name | Cert | FIN | Location | Effective Date | Ins. Fund | Transaction Type | Charter Class | Failure / Assistance | Total Deposits | Total Assets | Estimated Loss 12/31/2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| COMMUNITY BANK OF THE OZARKS | 27331 | 10467 | SUNRISE, MO | 12/14/2012 | DIF | PA | NM | FAILURE | 41,881 | 42,816 | 14,350 |
| EXCEL BANK | 19186 | 10460 | SEDALIA, MO | 10/19/2012 | DIF | PA | NM | FAILURE | 173,670 | 186,113 | 29,246 |
| TRUMAN BANK | 27316 | 10458 | ST. LOUIS, MO | 9/14/2012 | DIF | PA | SM | FAILURE | 245,716 | 282,338 | 39,716 |
| GLASGOW SAVINGS BANK | 1058 | 10449 | GLASGOW, MO | 7/13/2012 | DIF | PA | NM | FAILURE | 21,809 | 22,341 | 1,396 |
| SUN SECURITY BANK | 20115 | 10400 | ELLINGTON, MO | 10/7/2011 | DIF | PA | NM | FAILURE | 280,649 | 351,492 | 93,109 |
| Total Failures | | | | | | | | 5 | 763,725 | 885,100 | 177,817 |
| Total Assistance Transactions | | | | | | | | 0 | 0 | 0 | N/A |
| Total Institutions | | | | | | | | 5 | 763,725 | 885,100 | 177,817 |

ATTACHMENT C



STATE OF MISSOURI
OFFICE OF SECRETARY OF STATE

IN THE MATTER OF:                                     )
                                                      )
CAMBRIDGE ADULT DAY CENTER WASHINGTON                 )
LLC; UNIVERSAL EXPORTS LIMITED II, LLC;               )
BROADCO, LLC; BROADWAY FUND I, LLC;                   )        Case No.:  AP-17-09
FORDYCE BROWN ENTERPRISES, LP;  ANNE                  )
REID PRODUCTS, LLC; SHAUN HAYES; CHARLES              )
LEHNBEUTER; and WILLIAM DARMSTAEDTER, II,             )
                                                      )
                    *Respondents.*                    )

**FINAL ORDER TO CEASE AND DESIST AS TO RESPONDENTS CAMBRIDGE
ADULT DAY CENTER WASHINGTON, LLC; UNIVERSAL EXPORTS LIMITED II,
LLC; BROADCO, LLC; BROADWAY FUND I, LLC; FORDYCE BROWN
ENTERPRISES, LP; ANNE REID PRODUCTS, LLC; AND SHAUN HAYES AND
ORDER AWARDING RESTITUTION, CIVIL PENALTIES, AND COSTS**

Now on the 14th day of September, 2017, the Commissioner, having reviewed this matter, issues
the following findings and order:

## I.    PROCEDURAL BACKGROUND

1.    On May 12, 2017, the Enforcement Section of the Missouri Securities Division of the
      Office of Secretary of State ("Enforcement Section"), through Director of Enforcement
      Saundra J. McDowell, submitted a Petition for Order to Cease and Desist and Order to
      Show Cause Why Restitution, Civil Penalties, And Costs Should Not Be Imposed.

2.    On May 19, 2017, the Missouri Commissioner of Securities ("Commissioner") issued an
      Order to Cease and Desist and Order to Show Cause Why Restitution, Civil Penalties,
      and Costs Should Not Be Imposed ("Order"). On that same day, a copy of the Order and
      Notice of Right to Request a Hearing were sent, via U.S. Certified mail, return receipt
      requested, to Respondents' last known addresses.

3.    On or about May 19, 2017, a copy of the Order to Cease and Desist was made available
      to the general public on the Missouri Secretary of State's website.[1]

---
[1] https://www.sos.mo.gov/CMSImages/Securities/AP-17-09.pdf

1

ATTACHMENT D

4.    On or about June 14, 2017, Respondent Charles K. Lehnbeuter ("Lehnbeuter") requested a 30-day extension to request a hearing.

5.    On June 15, 2017, the Commissioner issued an Order extending Respondents' time to file a request for hearing, in compliance with 15 CSR 30-55.020, until July 14, 2017, at 5 p.m.

6.    On July 5, 2017, the Commissioner issued a Consent Order as to Respondent William Darmstaedter, II ("Darmstaedter"). A copy of the Consent Order was made available to the general public on the Missouri Secretary of State's website.[2]

7.    On or after July 7, 2017, the Commissioner received a return receipt signed by an agent of the Warren County Sheriff's Office, sent to the attention of Shaun Hayes, 104 West Main Street, Suite A, Warrenton, Missouri 63383.

8.    On July 12, 2017, the Commissioner issued a Consent Order as to Respondent Charles K. Lehnbeuter. A copy of the Consent Order was made available to the general public on the Missouri Secretary of State's website.[3]

9.    On July 12, 2017, the Commissioner received a letter from Respondent Shaun Hayes ("Hayes") requesting an extension to request a hearing.

10.   On July 12, 2017, the Commissioner issued an Order extending Respondents' time to file a request for hearing, in compliance with 15 CSR 30-55.020, until August 11, 2017, at 5 p.m.

11.   On September 6, 2017, the Enforcement Section submitted a Motion for Final Order.

12.   Respondents failed to request a hearing within the time allowed by Section 409.6-604, RSMo. (2016).[4]

13.   The Commissioner has not ordered a hearing in this matter pursuant to Section 409.6-604.

14.   To date, Respondents have failed to respond to the Motion for Final Order.

## II.    FINDINGS OF FACT

### A.    Summary

15.   From at least 2012 to 2014, Respondents Hayes and Lehnbeuter offered and/or sold securities in and/or from Missouri raising in excess of $1.3 million from ten or more

---

[2] https://www.sos.mo.gov/CMSImages/Securities/AP-17-09C.pdf
[3] https://www.sos.mo.gov/CMSImages/Securities/AP-17-09LC.pdf
[4] Unless otherwise noted, all statutory references are to the 2016 Revised Statutes of Missouri.

2

ATTACHMENT D

investors for, among other things, purported real estate investments and investments in adult care facilities named Cambridge Adult Day Center ("Cambridge ADC" or "CADC") in, among other places, St. Louis, Missouri. Darmstaedter signed promissory notes for some of the investments and is the registered agent for many of the entities involved. The investigation revealed that, although some funds were spent on the CADC facilities, much of the funds were diverted to other accounts that Hayes and/or Lehnbeuter controlled and spent on other business or personal expenses. Total investor losses exceed $1 million.

### B.   <u>Respondents and Related Parties</u>

16.   Cambridge Adult Day Center Washington, LLC ("Cambridge ADC" or "CADC") is a limited liability company organized in the state of Missouri on March 13, 2014.  Its registered agent is Darmstaedter with an address of 3640 Market Street, St. Louis, Missouri, 63110. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by CADC.

17.   Universal Exports Limited II, LLC ("Universal Exports") is a limited liability company organized in the state of Missouri on January 3, 2013. Its registered agent is Darmstaedter with an address of 117 Greenbriar Estates Drive, St. Louis, Missouri, 63122. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Universal Exports.

18.   Broadco, LLC ("Broadco") is a limited liability company organized in the state of Missouri on September 16, 2013. Its registered agent is Darmstaedter with an address of 117 Greenbriar Estates Drive, St. Louis, Missouri, 63122. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Broadco.

19.   Broadco East, LLC ("Broadco East") is a limited liability company organized in the state of Missouri on September 17, 2013. Its registered agent is Darmstaedter with an address of 117 Greenbriar Estates Drive, St. Louis, Missouri, 63122. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Broadco East.

20.   Broadway Fund I, LLC ("Broadway") is a limited liability company organized in the state of Missouri on April 3, 2013. Its registered agent is Darmstaedter with an address of 117 Greenbriar Estates Drive, St. Louis, Missouri, 63122. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Broadway.

ATTACHMENT D

21.   Fordyce Brown Enterprises, L.P. ("Fordyce") was formed in the state of Missouri on September 4, 2012. Its registered agent is Michael E. Kohn with an address of 7700 Bonhomme Avenue, Suite 510, Clayton, Missouri, 63105. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Fordyce.

22.   Anne Reid Products, LLC ("Anne Reid") is a limited liability company organized in the state of Missouri on February 11, 2013. Its registered agent is Darmstaedter, with an address of 117 Greenbriar Estates Drive, St. Louis, Missouri, 63122. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Anne Reid.

23.   Cambridge Adult Day Center Michigan, LLC ("Cambridge Michigan") is a limited liability company organized in the state of Missouri on February 6, 2012, and administratively dissolved on December 30, 2016, for failure to maintain a registered agent. Its registered agent was Thomas Daiber with an address of 4 Almont Acres, St. Louis, Missouri, 63124. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Cambridge Michigan.

24.   4249 Michigan, LLC ("4249 Michigan") is a limited liability company organized in the state of Missouri on February 27, 2013 and administratively dissolved on May 26, 2015, for failure to maintain a registered agent. Its registered agent was Darmstaedter with an address of 14248 F Manchester Road, #123, Manchester, Missouri, 63011. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by 4249 Michigan.

25.   The Bridge Adult Day Care, LLC ("The Bridge") is a limited liability company organized in the state of Missouri on August 13, 2013. It was administratively cancelled on May 26, 2015, for failure to maintain a registered agent. Its registered agent was Darmstaedter, with an address of 14248F Manchester Road, #123, St. Louis, Missouri, 63011. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by The Bridge.

26.   Ridgeview Holdings, LLC is a limited liability company organized in the state of Missouri on May 4, 2012. Its registered agent is Michael Kohn with an address of 7700 Bonhomme Avenue, Suite 510, Clayton, Missouri, 63105. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by Ridgeview Holdings, LLC.

4

ATTACHMENT D

27.  LoanSum, LLC is a limited liability company organized in the state of Missouri on September 10, 2007. Its registered agent is Greg Daney with an address of 150 Weldon Parkway, Suite 103, Maryland Heights, Missouri, 63043. A check of the records maintained by the Commissioner indicates that at all times relevant, there was no registration, granted exemption, or notice filing indicating status as a "federal covered security" for any securities issued by LoanSum, LLC.

28.  Hayes is a 57 year-old Missouri resident with a last known address of 9 Fordyce Lane, St, Louis, Missouri, 63124. A check of the Central Registration Depository ("CRD") indicates that Hayes has never been registered with a broker-dealer or investment advisory firm. The Federal Deposit Insurance Corporation ("FDIC") banned Hayes from the banking industry on December 30, 2013, for among other things, dishonest and unethical conduct while Hayes served as President of Sun Security Bank. On April 13, 2016, Hayes was indicted for bank fraud by the U.S. Attorney's Office for the Eastern District of Missouri. The indictment is not related to this matter.

29.  Lehnbeuter is a 63 year-old Missouri resident with a last known address of 8333 Knollwood Drive, St. Louis, Missouri, 63121. A check of the CRD indicates that, at all times relevant to this matter, Lehnbeuter was not registered with a broker-dealer or investment advisory firm. In 2006, Lehnbeuter pled guilty to filing false tax returns.

30.  Darmstaedter is a 70 year-old Missouri resident with a last known address of 117 Greenbriar Estates Drive, St. Louis, Missouri, 63122. A check of the CRD indicates that at all times relevant to this matter, Darmstaedter was not registered with a broker-dealer or investment advisory firm. Darmstaedter was previously licensed for over 25 years until his license lapsed in 2007. Darmstaedter was licensed under AG Edwards, Boatmen's National Bank of St. Louis, Nationsbank, and Bank of America.

## C.    Enforcement Section Investigation

31.  On or around May 13, 2015, the Enforcement Section opened an investigation on Cambridge ADC, Hayes, Lehnbeuter, and Darmstaedter after receiving information that the aforementioned persons were allegedly soliciting, among other things, unregistered investments in CADC facilities. Among the information evaluated by the Enforcement Section was an article dated March 20, 2015, in the St. Louis Business Journal titled *Shaun Hayes' New Venture.* The article explains, among other things, Hayes' and Lehnbeuter's efforts to raise investment funds to open several CADC facilities.

## Missouri Resident 1 ("MR1")

32.  On or about June 2, 2015, the Enforcement Section interviewed 68 year-old Eugene, Missouri resident MR1, who said, among other things:

   a.    MR1 first met Hayes several years ago when Hayes was a commercial loan officer;

ATTACHMENT D

b.   in 2013, Hayes solicited MR1 to obtain a nearly $2 million loan from Prescient Bank in Wisconsin (upon information and belief, the specific loan amount was $1.65 million). The funds were to be used to open the first CADC facility at 4249 Michigan in St. Louis, Missouri. Hayes could not obtain the loan himself due to the FDIC Order and subsequent judgments as a result of the failed banks Hayes was affiliated and/or associated with;

c.   Hayes promised MR1 a "good return," and Hayes told MR1 the loan would be paid off using loan funds from the U.S. Department of Housing and Urban Development ("HUD") Hayes expected to receive. Additionally, MR1 would receive a $100,000 "guarantors fee";

d.   MR1 trusted Hayes and signed all documents related to the Prescient Bank loan. MR1 never saw the closing documents related to the property at 4249 Michigan;

e.   MR1 became 80% owner of the CADC facility and Hayes and Lehnbeuter shared 20%. Lehnbeuter would later send unsigned documents to the Enforcement Section that suggested MR1 was 40% owner, Hayes 30%, and Lehnbeuter 30%;

f.   4249 Michigan became the "owner" of the building, and a US Bank account was opened under the name of 4249 Michigan, LLC. Hayes and MR1 were both signatories on the account, but MR1 trusted Hayes to manage the financial affairs;

g.   eventually, Hayes and Lehnbeuter would deny MR1 access to documents and bank records for 4249 Michigan. MR1 believes that MR1's name was "whited out" on several documents MR1 believes MR1 signed. However, MR1 could not recall specifically what documents were allegedly altered. MR1 was removed as signatory on the 4249 Michigan, LLC US Bank account but later obtained the bank records and alleged that at least $1 million was missing from the account. MR1 alleged that Hayes and Lehnbeuter spent the funds on personal expenses not related to 4249 Michigan;

h.   by November 2013, MR1 missed several mortgage loan payments and the St. Louis County Circuit Court put the property into receivership. The loan Hayes promised to obtain from HUD had not been retained by Hayes;

i.   in June 2014, Prescient Bank took over the property and sued 4249 Michigan; and

j.   by September 2014, MR1 was experiencing severe financial difficulty and MR1 and MR1's wife filed Chapter 7 bankruptcy around that time.

33.   The Enforcement Section reviewed the US Bank account for 4249 Michigan from April, 2013, to April, 2015, and it appeared that no fraudulent activity took place in the account.

6

ATTACHMENT D

### $90,000 Loan Sale Agreement

34.   On or around March 22, 2013, a Loan Sale Agreement was executed between Universal Exports and People's National Bank in which Universal Exports paid $90,000 to People's National Bank to pay off MR1's farm land. Universal Exports now holds a second deed of trust on MR1's farm land. The source of the $90,000 is detailed below.

35.   In an April 2, 2013, email from Hayes to MR1, in which Lehnbeuter was included, Hayes listed the amount of funds owed to MR1 including:

   a.   a $100,000 guarantor's fee for obtaining the $1.65 million loan for 4249 Michigan;

   b.   a $45,000 fee for "48 Units"; and

   c.   a $25,000 fee for "Shirley Condos".

### $70,079.71 Loan to Universal Exports

36.   On or around April 11, 2013, MR1 loaned $70,079.71 to Universal Exports, Lehnbeuter, and Hayes, purportedly as an additional investment in 4249 Michigan. MR1, through MR1's Missouri limited liability company, executed a promissory note with Universal Exports, Lehnbeuter, and Hayes in which Universal Exports, Lehnbeuter, and Hayes promised to pay MR1 on or before October 11, 2013, with interest accruing $60.60 per day until the amount was paid in full. Upon information and belief, MR1 received no funds back for this loan.

37.   On April 29, 2013, a promissory note was executed between MR1's Missouri limited liability company and Universal Exports in which MR1 was to pay $96,200 at 15% interest in seven installments beginning on May 31, 2013, and ending on November 30, 2013. This transaction was the result of Universal Exports, Hayes, and Lehnbeuter paying off MR1's farm loan with People's National Bank. Upon information and belief, this loan was not paid back by MR1.

38.   In a June 7, 2013, email to Lehnbeuter and Hayes, MR1 asked "what project was the $70,079.71 used for? (Just for my notes)." Upon information and belief, MR1 never received an answer concerning how Lehnbeuter and/or Hayes spent the funds.

### Missouri Resident 2 ("MR2") and Missouri Resident 3 ("MR3")

39.   On September 2, 2015, the Enforcement Section interviewed 64 year-old MR2 and MR2's 57 year-old spouse MR3, both residents of St. Louis, Missouri.

40.   Sometime in or around late 2012, Lehnbeuter solicited MR2 to invest in real estate. In particular, Lehnbeuter told MR2 that the investment funds would be used to invest in lots located in Kansas City, Missouri. MR2 described the investment as "speculative" and that

ATTACHMENT D